Filed 11/7/25

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MUSHEG TOKHUNTS,<br><br>    Defendant and Appellant. | B330660<br><br>Los Angeles County<br>Super. Ct. No. PA096368 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Terrell, Judge.  Affirmed.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

[*]     Under California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts 2, 3, 4, and 5 of the Discussion section.

A jury convicted Musheg Tokhunts of felony child abuse, misdemeanor battery on a spouse, and felony battery with serious bodily injury. The evidence at trial showed Tokhunts grabbed and pulled his four-year-old son out of his mother's arms, causing the child to suffer a broken elbow. The court sentenced Tokhunts to six years in prison, which included an upper term on the child abuse count.

On appeal, Tokhunts argues the trial court erred by sustaining the prosecutor's objection to one of his peremptory challenges, declining to admit evidence under a hearsay exception, failing to instruct the jury on lesser included offenses, relying on an aggravating circumstance not found true by a jury, and declining to award him custody credit for time served in another case. In the published portion of the opinion, we hold it is not structural error for a trial court erroneously to sustain a prosecutor's objection to a single peremptory challenge. Assuming the court erred here, we conclude the error was harmless and does not require reversal. We reject Tokhunts's remaining arguments in the unpublished portion of the opinion. We affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

The People charged Tokhunts with felony child abuse under circumstances likely to cause great bodily injury (Pen. Code, § 273a, subd. (a)),[1] misdemeanor battery of a spouse (§ 243, subd. (e)(1)), and felony battery with serious bodily injury (§ 243, subd. (d)). The People alleged Tokhunts's son, Daniel, was the victim of the child abuse and battery with serious bodily injury.

---

[1] Unless otherwise noted, undesignated statutory references are to the Penal Code.

On all three counts, the People alleged an aggravating circumstance that Tokhunts has prior convictions that are numerous and of increasing seriousness. (Cal. Rules of Court, rule 4.421(b)(2).) On the felony counts, the People also alleged an aggravating circumstance that the victim was particularly vulnerable. (*Id.*, rule 4.421(a)(3).)

## 1. *The People's evidence*

The case went to trial. The People presented testimony from Tokhunts's spouse, Narine. Narine testified that she and Tokhunts had been married for five years, but they were in the process of getting divorced. They shared custody of their child, Daniel.

### a. *Uncharged incidents*

Narine testified to several incidents of uncharged domestic violence that took place in early 2021, when Daniel was four years old. The incidents seemed to stem from Tokhunts's delusional belief that Narine was having an affair.

During one incident, Narine woke up in the middle of the night to Tokhunts pressing a BB gun to her cheek.[2] Tokhunts asked Narine, " 'Who is your boyfriend? Tell me the name.' " Narine thought the gun was real, and she was worried Tokhunts would harm her. She eventually calmed herself down, pushed the gun away from her face, and told Tokhunts she was not cheating on him.

A few days later, Tokhunts again accused Narine of cheating on him. Tokhunts started shooting the ceiling and walls inside the house with a BB rifle. Tokhunts grabbed Daniel—

---

[2] Narine referred to Tokhunts's guns as "BB" guns, while Tokhunts referred to them as "airsoft" guns.

who was sleeping upstairs—and took him to a hotel, where they spent the night.

Another time, Tokhunts took Daniel to a pool during the day and refused to bring him home afterwards. Narine was upset and went to her cousin's house. Tokhunts showed up at the cousin's house later that night, and he brought Daniel with him. Narine thought Tokhunts was under the influence of drugs. Tokhunts started yelling from outside the house, threatening to shoot Narine's "boyfriend" and anyone connected to him. He sent Narine a text message warning that her relatives might be shot in the head if her boyfriend was in the house.

Tokhunts eventually drove away with Daniel. Daniel was seated in the front passenger seat of the car and was not wearing a seat belt. Tokhunts brought Daniel home the next day.

Tokhunts took Daniel to a hotel a few days later. While they were gone, Narine discovered a security camera hidden in her closet. Tokhunts started yelling at Narine through the camera. He called her offensive names and yelled for her "boyfriend" to leave the house. Tokhunts then remotely activated the house's alarm system.

Tokhunts returned to the family home with Daniel the next day, March 1, 2021. He was angry and told Narine she did not deserve to be a mother. Tokhunts threw glass picture frames and shot a BB gun at the ceiling.

Narine left the house with Daniel and went to stay with relatives. The relatives helped Narine get an emergency restraining order against Tokhunts. Tokhunts moved out of the family home that same day. A few days later, Narine filed a request for another restraining order.

b.    *The charged incident*

The events that led to the charges took place at the family home on March 12, 2021. Narine's mother, Lala, was visiting at the time. Narine, Lala, and Daniel were sitting on a couch watching television when Narine noticed Tokhunts's car pull up outside. Tokhunts walked into the house through a door he had broken the day before. He was angry and asked Narine, " 'Why are you lying about the restraining order?' "

Daniel was seated between Narine and Lala. Narine wrapped her arms around the child, hugging his body. Lala told Tokhunts to calm down, and he took a seat on the opposite side of the couch.

Tokhunts told Daniel to come to him, but Daniel refused and said, "I don't want to go." Tokhunts asked Narine, " 'What did you do to my son that he doesn't want to come to me?' " Tokhunts stood up, grabbed Daniel's hand, and started to pull the child towards him. Tokhunts pulled hard, and Narine let go of Daniel so he would not be hurt. Tokhunts started walking away while holding Daniel. Narine followed behind them, begging Tokhunts to leave Daniel with her. Tokhunts pushed Narine "hard," and she fell backwards.

Tokhunts left the house with Daniel and got into the driver's seat of his car. Tokhunts put Daniel on his lap and drove away. Narine called 911.

About three hours later, a police officer called Narine and told her Daniel was in the hospital with a broken arm. Narine went to the hospital, and she found Daniel crying with a cast on his arm.

The doctor who treated Daniel testified that the child suffered a non-displaced fractured elbow. According to the

doctor, Tokhunts said he grabbed and pulled Daniel by the arm to get him to leave his mother's house. The doctor asked Daniel what happened to his arm, and Daniel said, " 'he pulled me,' " referring to Tokhunts. Tokhunts was acting strangely at the hospital, and the doctor believed he was under the influence of methamphetamines.

**2.        *The defense evidence***

Tokhunts testified in his own defense. He denied engaging in any domestic violence or substance abuse while he was living with Narine and Daniel.

According to Tokhunts, he discovered in late February 2021 that Narine was having an affair. They were in the process of getting a divorce and agreed to split custody of Daniel. Tokhunts went to pick up Daniel on March 1, 2021, but the police arrested him and served him with an emergency restraining order. The restraining order was in effect until March 8, 2021.

Tokhunts tried to arrange visits with Daniel after the restraining order expired. Narine ignored Tokhunts's requests, so he decided to go to the family home on March 12, 2021. Tokhunts went inside the house and saw Daniel sitting between Narine and Lala on a couch.

Tokhunts called for Daniel to come to him. Daniel tried to get up, but Narine physically held him back with her arm. Tokhunts walked over to Daniel and picked up the child. Narine was restraining Daniel, but she was not using "harsh restraint."

Tokhunts put his hands under the child's armpits, lifted the child up to his chest, and then put one hand under the child's buttocks for support. A "split second" passed between when Tokhunts lifted the child and the child was against his chest.

Tokhunts never pulled Daniel, and he did not struggle with Narine over the child.

Narine and Lala came towards Tokhunts as he was holding Daniel. They were "wide-eyed" with "malicious" looks on their faces. Tokhunts started to back up. Narine and Lala tried to grab Daniel, pulling at the child's arms. Tokhunts tried to protect Daniel, but he never pushed Narine.

Tokhunts took Daniel outside to his car and put the child on his lap. Tokhunts had a child seat, but he did not use it because he wanted to avoid a confrontation with Narine. Tokhunts drove half a block with Daniel on his lap, stopped the car, and then put Daniel in the car seat.

Daniel complained about his arm while they were driving. Tokhunts took Daniel to a hospital after noticing his hand was swollen and stiff. At some point, Tokhunts left to get food for Daniel. The police arrested Tokhunts when he returned to the hospital.

Tokhunts also presented expert testimony from a pediatric orthopedic surgeon. According to the doctor, Daniel suffered a non-displaced fracture directly above his right elbow. The injury would have caused pain immediately, but it could have taken hours for the swelling to occur.

The doctor explained the type of injury Daniel suffered typically results from a child falling and hyper-extending an elbow. Absent a fall, the injury requires a "bending moment" around a "fulcrum" restricting the arm's movement. The injury would not occur if a person simply grabbed the child's wrist and pulled in one direction. However, it could occur if someone grabbed the child's arm within an inch or two of the elbow.

### 3. *The verdict, bench trial, and sentencing*

The jury convicted Tokhunts as charged and found true the allegation that the victim was particularly vulnerable. After the jury returned its verdict, the court conducted a bench trial on the aggravating circumstance concerning Tokhunts's criminal history. The People presented evidence that Tokhunts had been convicted of five felonies and two misdemeanors between 2007 and 2011. The court found the People had proven, beyond a reasonable doubt, Tokhunts had suffered numerous convictions that increased in seriousness.

The court sentenced Tokhunts to six years in prison. The court selected the upper term of six years on the child abuse count, noting it relied solely on the aggravating circumstance related to Tokhunts's criminal history. On the misdemeanor battery count, the court imposed a concurrent 364 day sentence. The court imposed one year on the felony battery count, which it stayed under section 654.

Tokhunts timely appealed.

## DISCUSSION

### 1. *The trial court did not commit prejudicial error by sustaining an objection to one of Tokhunts's peremptory challenges*

Tokhunts contends the trial court committed reversible error by sustaining the prosecutor's objection to his peremptory challenge to a prospective juror.

#### a. *Background*

During voir dire, a prospective juror—Juror No. 1—stated she had previously worked at the Y.W.C.A. in the Rape Crisis Department and Child Abuse Prevention Program. The juror

8

explained she acted as an advocate for victims of domestic violence and provided services to abused children.

The court asked Juror No. 1 if she could set aside her past experiences "so that when you hear the testimony in this case, you make a decision based only on the testimony here, not on what you learned . . . or experienced through your job, through your interaction with people who were victims or accused perpetrators." The juror responded, "I think so. But a lot of the rape victims I worked with . . . were married and also suffered . . . domestic violence along with rape, and it's hard when you've worked with children that have been through that, but I would try."

The court presented Juror No. 1 with a hypothetical situation in which she had been the victim in a traffic collision and was a juror in a case involving a similar incident. The court asked if the juror could "put that personal experience aside and just make a decision on whatever is presented in that case in that courtroom?" Juror No. 1 replied, "I think so. Yeah. . . . Yes."

Defense counsel exercised a peremptory challenge to Juror No. 1. The prosecutor objected. At the prosecutor's request, the court gave the parties time to research the recent changes to the law on peremptory challenges.

The court addressed the issue the next day. The court began the discussion by noting the law precludes the use of peremptory challenges based on a list of "cognizable groups," and the only "potential group that this individual is part of is a gender group." The court explained, because "[w]omen have traditionally been underrepresented in many aspects of society," the law requires the defense to state for the record the grounds for challenging the prospective juror.

9

Defense counsel told the court he did not challenge Juror No. 1 because of her gender. Instead, he was concerned the juror "has been an advocate for abused people," which might "lead to [a] bias towards" his client.

The prosecutor told the court he objected to the peremptory challenge because it was based on "actual bias or a perceived bias against this potential juror because she is somebody who had worked in the [domestic violence] field before." The prosecutor argued the use of a peremptory challenge did not have to be based on the prospective juror's gender in order to be objectionable. Instead, according to the prosecutor, recent amendments to the law eliminated all "unfair exclusion based on group membership" and "kicked th[e] door wide open to include just about anything," including a prospective juror's line of work. He suggested the new law prohibits the use of peremptory challenges on grounds that the prospective juror is a teacher, social worker, or minister.

The prosecutor also asserted the law requires empirical data to overcome an objection, which defense counsel could not provide because he did not ask Juror No. 1 any questions during voir dire. Moreover, the juror explicitly said she would "not have any biases or be impacted by her previous experiences," could set aside her experiences, and would be fair to both sides.

Defense counsel did not respond to the prosecutor's argument and submitted the issue.

The court sustained the prosecutor's objection. The court noted, although defense counsel did not intentionally discriminate against the prospective juror, the question is "whether an objectively reasonable person would perceive unconscious bias." The court stated the prospective juror was

10

a member of the "category of individuals . . . who are victim advocates," and it acknowledged there is at least "an idea behind this challenge" based on the belief that "someone in this group is going to be biased in favor of alleged victims and against the defendant." However, the court found the record did not support defense counsel's concern. Instead, the prospective juror "made it clear to the court . . . that she could be fair and none of her work as an advocate would impact her ability to keep an open mind, to listen to all the evidence and the arguments and to be fair, to be impartial."

        b.    *Relevant law*

"Before January 1, 2022, trial courts examined peremptory challenges under the three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 . . . and *People v. Wheeler* (1978) 22 Cal.3d 258 . . . . Recognizing the limitations of the *Batson/ Wheeler* inquiry, the Legislature enacted Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill 3070) to add Code of Civil Procedure section 231.7, which creates new procedures for identifying unlawful discrimination in the use of peremptory challenges." (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943, fn. omitted.)

Effective January 1, 2022, Code of Civil Procedure section 231.7 (section 231.7) prohibits the use of a "peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subds. (a), (i).) If a party or the court objects to a peremptory challenge under the statute, "the party exercising

11

the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (*Id.*, subd. (c).)

The trial court must "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances. . . .  If the court determines there is a substantial likelihood that an objectively reasonable person would view [membership in a protected group], or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained." (§ 231.7, subd. (d)(1).)

The statute lists 13 reasons for exercising a peremptory challenge that are "presumed to be invalid." (§ 231.7, subd. (e).) The list includes a juror's "[e]mployment in a field that is disproportionately occupied by members [of a group protected under the statute] or that serves a population disproportionately comprised of members of a group or groups" protected under the statute. (*Id.*, subd. (e)(10).)

The party exercising a peremptory challenge for a presumptively invalid reason must "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's [membership in a protected group], or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (§ 231.7, subd. (e).)

Section 231.7 specifies the standard of review appellate courts must apply when reviewing the denial of an objection under the statute.  It provides the court must review the issue "de novo, with the trial court's express factual findings reviewed for substantial evidence." (§ 231.7, subd. (j).)  If the reviewing

12

court concludes the trial court erred in denying an objection, the error "shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*; see *People v. Ortiz* (2023) 96 Cal.App.5th 768, 795.)

The statute is silent as to the standard of review and remedy when a defendant claims a trial court erroneously sustained an objection to a peremptory challenge, as Tokhunts contends here.

c.    *Application*

The record shows the prosecutor misunderstood the law, incorrectly believing section 231.7 prohibits challenges to jurors based on their membership in any group.  Contrary to the prosecutor's assertions, the law prohibits only challenges to jurors based on their real or perceived membership in a limited set of protected groups.  (See § 231.7, subd. (a).)

It is less clear whether the trial court shared the prosecutor's misunderstanding.  At the start of the discussion, the court noted Juror No. 1's gender was the only possible ground for objecting to the peremptory challenge.  Gender is a protected group under section 231.7.  (See § 231.7, subd. (a).)  Therefore, the court would have properly sustained the objection if it concluded "there is a substantial likelihood that an objectively reasonable person would view . . . gender . . . as a factor in the use of the peremptory challenge."  (*Id.*, subd. (d)(1).)

It also is possible the court concluded "victims' advocate" is an occupational field that is "disproportionately occupied by" women or that "serves a population disproportionately comprised of" women.  (§ 231.7, subd. (e)(10).)  If so, defense counsel's use of a peremptory challenge based on Juror No. 1's employment would have been presumptively invalid, shifting the burden

13

to the defense to "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's . . . gender . . . , and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Id*., subd. (e).) If the defense failed to meet that burden, the court would have properly sustained an objection under section 231.7.[3]

It is not clear, however, whether the court sustained the objection for those reasons. The court did not explicitly refer to the juror's gender while announcing its ruling. Nor did it state defense counsel's proposed reason for challenging the juror was presumptively invalid. Instead, the court simply noted the record refuted counsel's concern that Juror No. 1 was biased against Tokhunts.

However, we need not decide whether the court complied with section 231.7. Assuming for the sake of argument the court erred, the error was harmless and does not require reversal.

Tokhunts argues he does not have to establish prejudice because it is structural error for a trial court erroneously to sustain an objection to a defendant's peremptory challenge. The court in *People v. Singh* (2015) 234 Cal.App.4th 1319 (*Singh*) rejected the same argument. In *Singh*, the prosecutor objected to the defense's peremptory challenge to Juror No. 416024, arguing the challenge was based on the juror's race. (*Id.* at pp. 1323–1325.) The prosecutor asked the court to impose monetary sanctions on defense counsel if he continued to make

---

[3]    Even if the prosecutor did not object specifically on these grounds, a trial court may object on its own motion to an unlawful use of a peremptory challenge. (§ 231.7, subd. (b).)

improper challenges. (*Id*. at p. 1325.) The trial court sustained the objection, without imposing sanctions. The court clarified that defense counsel could challenge the juror again if he articulated a race-neutral reason for doing so. After additional voir dire, the court told defense counsel he "should not hesitate" to challenge Juror No. 416024. (*Ibid*.) Defense counsel did not challenge the juror, noting he felt a "chilling effect" from the court's earlier order. (*Ibid*.) After both sides accepted the jury as constituted—which included Juror No. 416024—defense counsel told the court he would have exercised more peremptory challenges, but he declined to do so "out of concern that the court would not sustain the challenge[ ]." (*Id*. at pp. 1325–1326.)

On appeal, the defendant argued the trial court erred in sustaining the prosecutor's objection to his peremptory challenge to Juror No. 416024. (*Singh, supra*, 234 Cal.App.4th at pp. 1322, 1329.) The defendant also argued the trial court chilled his counsel's advocacy by suggesting it would impose sanctions for improper challenges. (See *ibid*.) The Court of Appeal assumed, without deciding, the trial court erred. Nevertheless, it concluded the defendant failed to show resulting prejudice. (*Id*. at p. 1329.)

Like Tokhunts, the defendant in *Singh* argued it is structural error for a trial court erroneously to sustain an objection to a defendant's peremptory challenge. (See *Singh, supra*, 234 Cal.App.4th at p. 1331.) The court rejected the argument, explaining "structural error exists only in a very *limited* class of cases (generally involving an impingement on the right to counsel or self-representation, bias on the part of the court or jury, a defective instruction on reasonable doubt, the denial of a public trial, and an erroneous *denial* of a *Wheeler–*

15

*Batson* motion) in which the error has the effect of rendering the factfinding process unreliable, or causing the trial to be fundamentally unfair." (*Id.* at p. 1330.)  The court determined an erroneous ruling sustaining an objection to a defendant's peremptory challenge does not fall within that narrow class.

The court reasoned that, under United States Supreme Court precedent, peremptory challenges are not protected components of the federal constitutional right to a fair and impartial jury, nor does the denial of a specific peremptory challenge "result in any fundamental unfairness, or interference with the reliability of the jury's factfinding function." (*Singh, supra*, 234 Cal.App.4th at pp. 1329–1331, citing *Ross v. Oklahoma* (1988) 487 U.S. 81 and *Rivera v. Illinois* (2009) 556 U.S. 148.)  The court was not persuaded by the fact that establishing prejudice under these circumstances is difficult, noting the United States Supreme Court rejected a similar contention.  (*Singh*, at p. 1331.)  The court also noted a rule of automatic reversal would discourage trial courts and prosecutors from policing a defendant's discriminatory use of peremptory challenges.  (*Ibid.*)

Having determined the error did not warrant automatic reversal, the *Singh* court next considered whether the defendant had made a sufficient showing of prejudice.  The court applied the prejudice standard the California Supreme Court articulated in *People v. Black* (2014) 58 Cal.4th 912 (*Black*), which we discuss below.  The court concluded the defendant suffered no prejudice from the erroneous ruling itself, the threat of sanctions, or the seating of an objectionable juror.  (*Singh, supra*, 234 Cal.App.4th at p. 1332.)  Accordingly, the court held any error was harmless

16

and did not warrant reversal of the judgment. (*Id*. at pp. 1332–1333.)

We find the *Singh* court's analysis to be sound, and we similarly conclude it is not structural error for a trial court erroneously to sustain a single objection to a defendant's peremptory challenge.[4] "There is a strong presumption that any error falls within the trial error category, and it will be the rare case where [an error] will not be subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) This is not one of those rare cases.[5]

For us to hold otherwise would be inconsistent with *Black, supra*, 58 Cal.4th 912. In that case, the trial court denied the defendant's for-cause challenges to two jurors, which prompted

---

[4] The prosecutor in *Singh* objected under the *Batson/Wheeler* framework, while the prosecutor here objected under section 231.7. Tokhunts does not argue that distinction is meaningful, nor can we conceive of any reason it would be.

[5] We express no opinion on whether it is structural error for a trial court erroneously to preclude a defendant from exercising more than one peremptory challenge. At some point, a court's repeated errors might constitute denial of the defendant's statutory right to the full complement of peremptory challenges, which is reversible error. (See *People v. Armendariz* (1984) 37 Cal.3d 573, 578–579, 584 [trial court's refusal to allow defendant to use 22 of 26 peremptory challenges was reversible error]; see also *Black, supra,* 58 Cal.4th at p. 921 [citing *United States v. Martinez–Salazar* (2000) 528 U.S. 304, 315, for the proposition that a "trial court may not deliberately (or repeatedly) force defendants to use peremptory challenges to cure trial court errors"].) We need not consider that issue because the trial court in this case made, at most, one error.

the defendant to remove the jurors using peremptory challenges. (*Id*. at p. 915.)  After the defendant exhausted all his peremptory challenges, he asked the court to grant him another peremptory challenge so he could remove Juror No. 8.  (*Ibid*.)  The court refused the request, and Juror No. 8 was seated on the jury.  The jury ultimately convicted the defendant.  (*Id*. at pp. 915–916.)

On appeal, the defendant argued reversal was required because the trial court erred in denying his for-cause challenges. (See *Black, supra*, 58 Cal.4th at p. 916.)  The defendant acknowledged that none of the jurors he challenged for cause sat on the jury, because he used peremptory challenges to remove them.  Nevertheless, he argued the trial court's errors were prejudicial because they forced him to waste peremptory challenges that he would have used to challenge Juror No. 8, who sat on the jury.  (See *id*. at pp. 917–918.)

The California Supreme Court assumed the trial court erred when it denied the defendant's for-cause challenges, but it held the errors were harmless.  (*Black, supra,* 58 Cal.4th at pp. 914, 917.)  The court distinguished objectionable jurors (jurors removable for lawful reasons not amounting to cause) from incompetent jurors (jurors subject to removal for cause). (*Ibid*.)  The court rejected the rule from other states that the erroneous denial of a for-cause challenge is prejudicial if an objectionable juror was seated.  (*Id*. at pp. 920–921.)  The court instead held a "defendant must show that the error affected his right to a fair trial and impartial jury.  When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have

18

been removed for cause, sits on the jury that decides the case." (*Id*. at p. 920.) The court concluded, because Juror No. 8 was objectionable but not incompetent, the defendant failed to show reversible error. (*Id*. at pp. 914, 921–922.)

In a concurring opinion, Justice Liu—joined by Justice Kennard—suggested the prejudice inquiry should include consideration of whether the error "substantially disadvantaged the defendant relative to the prosecution." (*Black, supra*, 58 Cal.4th at pp. 922–923 (conc. opn. of Liu, J.).) He observed, a "defendant cannot be said to have suffered substantial disadvantage with respect to the prosecution from the seating of a single objectionable juror. Neither the prosecution nor the defense has the right to an ideal jury, and both sides must sometimes accept less-than-ideal jurors given the limitations of the jury pool and available peremptory strikes." (*Id*. at p. 923.)

The harm in this case and the harm in *Black* are identical —the seating of an objectionable juror. The only difference is the type of error that caused the harm. In *Black*, the cause was the trial court's error in overruling the defendant's for-cause challenges. In this case, the cause was the trial court's error in overruling the defendant's peremptory challenge. A defendant's right to for-cause challenges is constitutionally guaranteed, while a defendant's right to peremptory challenges is not. (See *Black, supra*, 58 Cal.4th at pp. 916–917.) Therefore, it would not make sense for the error in *Black* to be subject to a harmless error analysis, but the error in this case to be structural.

Instead, we agree with the *Singh* court that the prejudice standard articulated in *Black* applies where—as here—a trial court erroneously sustains an objection to a defendant's peremptory challenge. To establish prejudice under that

19

standard, the defendant must show "the error affected his right to a fair trial and impartial jury." (*Black, supra*, 58 Cal.4th at p. 920.) A defendant's right to a fair trial and impartial jury is affected when "an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case." (*Ibid.*) It is not affected when an objectionable juror— a juror removable for lawful reasons other than for cause—sits on the jury. (See *id.* at pp. 914, 920.)

We are not persuaded by Tokhunts's attempts to distinguish *Singh*. Tokhunts suggests *Singh*'s holding is limited to its unusual facts and applies only if the defendant claims a trial court chilled his exercise of peremptory challenges. Tokhunts reads *Singh* too narrowly. Like Tokhunts, the defendant in *Singh* argued the trial court erred by sustaining the prosecutor's objection to his peremptory challenge. (*Singh, supra*, 234 Cal.App.4th at p. 1322.) Also like Tokhunts, the defendant in *Singh* claimed he suffered prejudice because the challenged juror was seated on the jury and voted to convict him. (See *id.* at pp. 1322, 1332.) Although some of *Singh*'s more unusual facts are absent here, the case is nevertheless directly on point.

Tokhunts argues the *Singh* court used "tortured reasoning" to reach its conclusion. He fails, however, to identify any logical errors in the court's reasoning. Tokhunts contends the court's holding is against the weight of authority, but he seems to be referring to decisions from courts in other states, which are not binding on us. (See *People v. Mays* (2009) 174 Cal.App.4th 156, 167.) The California Supreme Court in *Black* expressly declined to follow courts from other jurisdictions, and we do the same here. (See *Black, supra*, 58 Cal.4th at pp. 920–921.)

Nor are we persuaded by Tokhunts's attempts to distinguish *Black*. Tokhunts contends the alleged harm in *Black* was speculative, because the defendant merely claimed he would have used a peremptory challenge to remove Juror No. 8. Here, in contrast, Tokhunts actually did challenge Juror No. 1.

We do not find this distinction to be meaningful. At the outset, the harm in *Black* was far less speculative than Tokhunts suggests. Defense counsel in that case specifically asked the court to grant him an additional peremptory challenge so he could remove the objectionable juror. (*Black, supra*, 58 Cal.4th at pp. 914–915.) The parties did not dispute the defendant would have exercised the additional challenge had the trial court granted it, and the Supreme Court seemed to assume he would have. In any event, the court's reasoning in *Black* did not depend, in any way, on the fact that the defendant did not actually exercise a peremptory challenge to the juror. The court instead focused on the type of harm the defendant suffered— the seating of an objectionable juror—and concluded it did not warrant reversal. (*Id*. at pp. 920–922.)

Applying the *Black* standard here, we conclude Tokhunts has not shown prejudice. Tokhunts contends the court's error was prejudicial because the juror to whom he objected—Juror No. 1—was seated on the jury that convicted him. At most, the record shows Juror No. 1 was objectionable. Therefore, the fact she sat on the jury does not constitute prejudice. (See *Black, supra*, 58 Cal.4th at pp. 914, 920.) Accordingly, even assuming the trial court erred by sustaining the objection to Tokhunts's peremptory challenge to Juror No. 1, any error was harmless and does not require reversal.

Tokhunts contends he has established prejudice under the *Black* standard because Juror No. 1 was actually biased against him. In support, he points to the juror's comment during voir dire that she "would try" to remain fair and impartial, but "it's hard when you've worked with children that have been through" domestic violence.

"A party may challenge a prospective juror for actual bias, defined as a state of mind that would prevent that person from acting impartially and without prejudice to the substantial rights of any party." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488.) The California Supreme Court has explained the "trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses." (*People v. Clark* (2011) 52 Cal.4th 856, 895.) Therefore, when a juror makes remarks that are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. (*Ibid.*)

In this case, no one who directly observed Juror No. 1's demeanor and verbal responses during voir dire believed there were grounds to remove her for cause. According to the court, the juror "made it clear . . . that she could be fair and none of her work as an advocate would impact her ability to keep an open mind, to listen to all the evidence and the arguments and to be fair, to be impartial." The prosecutor similarly remarked that the juror said "she can set aside [her] experiences and be fair to both sides." Defense counsel did not challenge the court's or the prosecutor's characterization of the juror's remarks. Nor did he seek to remove the juror for cause. The court, prosecutor, and defense counsel were in the best position to determine Juror No. 1's state of mind. We decline to second guess their conclusion

that the juror's remarks during voir dire did not reflect actual bias.

[[Begin nonpublished portion.]]

2. ***The trial court did not abuse its discretion by excluding an out-of-court statement from an unavailable witness***

Tokhunts argues the trial court erred by refusing to admit an out-of-court statement Lala made concerning the incident. According to Tokhunts, the evidence was admissible under Evidence Code section 1230 because it was a statement against interest made by an unavailable witness.

a. *Background*

Before trial, defense counsel filed a motion seeking to admit under Evidence Code section 1230 a statement Lala made to the police. At a hearing on the motion, defense counsel said Lala is unavailable because she lives in Armenia. Counsel argued Lala's statement was against her penal interest because she admitted pulling on the child, which is the same type of conduct that led to the charges against Tokhunts.

Defense counsel was not able to produce Lala's exact statement. However, the prosecutor said he believed the statement appears in a police report from March 15, 2021, and he read into the record a few paragraphs from that report. In the portion the prosecutor read, Lala told the officer that Tokhunts said he wanted to spend time with Daniel, but Narine refused. Tokhunts grabbed the child by both of his arms and began pulling the child toward him. Lala and Narine " 'grabbed Daniel by his waist, rear end area, and pulled him back towards the couch.' " The child was crying and said he did not want to leave

23

with Tokhunts. Tokhunts overpowered the women, and they let go of Daniel's " 'waist/rear end.' " Tokhunts took the child and drove off with him.

The court excluded the statement as inadmissible hearsay. The court explained the statement was not against interest, because Lala claimed to be trying to protect the child from a threat.

b. *Analysis*

Under Evidence Code section 1230, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." To gain admission of hearsay evidence under Evidence Code section 1230, " '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711.) We review a trial court's refusal to admit evidence under Evidence Code section 1230 for an abuse of discretion. (*Ibid.*)

Here, the trial court did not abuse its discretion when it excluded Lala's statement.[6] Lala told the officer she and Narine

---

[6] In his appellate briefs, Tokhunts quotes and relies on testimony at the preliminary hearing concerning Lala's statement. In the trial court, Tokhunts did not specifically seek to admit that testimony. Accordingly, he has forfeited any claims concerning it. (See Evid. Code, § 354; *People v. Ramos* (1997)

grabbed Daniel only because Tokhunts was trying to take the child by force against his will.  No reasonable person in Lala's position would think her statement—which detailed her and Narine's efforts to protect a young child from a physical threat— would subject her or Narine to liability for battery or child abuse. Indeed, Lala admitted neither committing an unlawful touching nor inflicting pain on a child, which are elements of battery and child abuse, respectively.  (See §§ 242, 273a.)  Under these circumstances, the court acted well within its discretion in refusing to admit the statement under Evidence Code section 1230.  (See *People v. Huggins* (1986) 182 Cal.App.3d 828, 831–832 [statement was not admissible under Evidence Code section 1230 where a reasonable person in the declarant's position would not believe it exposed her to criminal liability].)

Even if the trial court should have admitted the statement, the error was harmless under any standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  Tokhunts argues the evidence was crucial to his defense because it "confirmed that any injury to Daniel was caused at least equally if not more so by [Lala's and Narine's] efforts to restrain him from visiting with Tokhunts."  Tokhunts suggests Lala's statement shows she or Narine provided the fulcrum on Daniel's arm that his expert testified was required to cause the injury.  Lala's statement, however, did no such thing.  She told the officer she and Narine

---

15 Cal.4th 1133, 1178 [the party seeking to admit hearsay evidence under an exception must make an offer of proof].)  Therefore, we limit our consideration to Lala's statement as recorded in the police report and read into the record.

25

grabbed Daniel by his "waist" and "rear end area," not by his arm. Accordingly, the statement did not show either woman created a "fulcrum" on Daniel's arm.

Moreover, even without Lala's statement, the jury heard evidence that Narine was restraining Daniel when he sustained the injury. Indeed, both Narine and Tokhunts testified to that fact at trial. Lala's statement did not portray the restraint in a way that was meaningfully different than the evidence presented at trial. The jury convicted Tokhunts despite that evidence, and there is no reason to suspect admission of Lala's statement would have led to a different result. Accordingly, any error was harmless beyond a reasonable doubt.

3. ***The trial court did not commit prejudicial error by failing to instruct the jury on lesser included offenses***

Tokhunts argues the trial court erred by failing to give sua sponte jury instructions on misdemeanor child abuse and simple battery, as lesser included offenses of felony child abuse and battery with the infliction of serious bodily injury.

Even in the absence of a request, a trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Rogers* (2006) 39 Cal.4th 826, 866 (*Rogers*).) A court must instruct on a lesser included offense if there is substantial evidence from which a jury could conclude the defendant is guilty of the lesser offense but not the greater offense. (*People v. Hughes* (2002) 27 Cal.4th 287, 366–367; *People v. Simon* (2016) 1 Cal.5th 98, 132.)

We will assume, for the sake of argument, the trial court was required to instruct on the lesser included offenses.

26

Nevertheless, reversal is not required because any error was harmless.

We review a trial court's failure to instruct on a lesser included offense for prejudice under the *Watson, supra*, 46 Cal.2d 818, harmless error standard. (*Rogers*, *supra*, 39 Cal.4th at pp. 867–868; see *People v. Schuller* (2023) 15 Cal.5th 237, 260.) Such an error "does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' " (*People v. Wyatt* (2012) 55 Cal.4th 694, 698; *People v. Beltran* (2013) 56 Cal.4th 935, 955.) Accordingly, a trial court's failure to instruct on a lesser included offense is harmless if the defendant "cannot demonstrate a reasonable probability that the jury would have—without the error—reached a different result." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 191.)

As relevant to this case, to convict a defendant of child abuse, the jury must find he inflicted "unjustifiable physical pain or mental suffering" on a child. (§ 273a, subd. (a); *People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980.) If the defendant acted "under circumstances or conditions likely to produce great bodily injury or death," he is guilty of a felony. (§ 273a, subd. (a).) Otherwise, he is guilty of a misdemeanor. (*Id.*, subd. (b).)

On the record before us, there is not a reasonable probability any juror believed Tokhunts committed only misdemeanor child abuse. There is no evidence of a child suffering unjustifiable physical pain or mental suffering, other than the pain Daniel experienced as a result of his broken elbow. The parties disputed the exact cause of the injury. However, they seemed to agree the injury occurred during an incident at

27

the family home on March 12, 2021. Only two witnesses to that incident testified at trial, Tokhunts and Narine.

Tokhunts testified that Daniel wanted to be picked up, so he lifted Daniel by placing his hands under the child's armpits. Tokhunts denied pulling the child by the hand or arm. He suggested Narine or Lala caused Daniel's injury by grabbing the child's arms while Tokhunts was holding him.

Under this version of events, Tokhunts did not cause Daniel's injury or otherwise inflict pain or suffering on the child. The infliction of pain or suffering is an element of both misdemeanor and felony child abuse. Therefore, if the jury believed Tokhunts's testimony, it would have found him not guilty of both forms of child abuse. The jurors instead convicted Tokhunts of felony child abuse, indicating they did not accept his version of the March 12 incident.

The jury instead must have believed Narine, who provided the only other direct evidence of the incident. Narine testified that Daniel refused to go to Tokhunts, and she wrapped her arms around the child's body to protect him. Tokhunts grabbed the child by the hand and pulled with enough force that Narine released her hold.

Under Narine's version of events, Tokhunts caused Daniel's injury by pulling the child by the hand with significant force. Considering Daniel's age and the severity of his resulting injury, the only reasonable conclusion from Narine's testimony is that Tokhunts acted under circumstances likely to produce great bodily injury. Because the jury's verdict indicates it believed Narine, there is not a reasonable probability any juror would have convicted Tokhunts of only misdemeanor child abuse had the court instructed on that offense. Accordingly, any error in

28

failing to give the instruction was harmless. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 [failure to instruct on a lesser included offense was harmless where the verdicts showed the jury rejected the defendant's version of events].)

The court's failure to instruct the jury on simple battery is harmless for similar reasons. The parties agree that simple battery is a lesser included offense of battery with the infliction of serious bodily injury, which we will refer to as aggravated battery. Both simple and aggravated battery require a "willful and unlawful use of force or violence upon the person of another." (§ 242.) A person is guilty of the greater offense if the battery inflicts serious bodily injury on the person. (§ 243, subd. (d).)

The jury necessarily found Tokhunts committed an unlawful touching during the March 12 incident, as it is an element of both simple and aggravated battery. Moreover, as we discussed, by convicting Tokhunts of child abuse, the jury must have found he caused Daniel to suffer the broken elbow. There is no dispute that a broken elbow qualifies as a "serious bodily injury" for purposes of an aggravated battery.

Accordingly, to convict Tokhunts of both simple battery and child abuse (whether a misdemeanor or felony), the jury would have had to find he committed an unlawful touching and caused Daniel's broken elbow, but the touching and the injury were not causally connected. If they were, Tokhunts would be guilty of an aggravated battery. Based on the evidence presented at trial, there is no plausible scenario under which a reasonable juror could have reached those conclusions. Therefore, there is no reasonable possibility the jury would have convicted Tokhunts of simple battery had the court instructed on that offense.

29

Tokhunts contends the jurors could have convicted him of the lesser offenses because the issue of whether he caused Daniel's injury was "hotly contested." According to Tokhunts, based on the evidence presented at trial, the jurors reasonably could have concluded Narine and Lala caused the injury, or that it was the result of a "freak accident."

Even assuming those were viable theories based on the evidence, we are confident the jury rejected them. For the reasons we discussed, the jury's guilty verdict on the child abuse count indicates the jurors believed Tokhunts caused Daniel's injury. Accordingly, the jurors must have rejected any theories in which Tokhunts was not the cause, including the theories he proposes.[7]

We disagree with Tokhunts's contention that the jury's questions during deliberations reflect their uncertainty over the cause of Daniel's injury. The jury asked the court, "If Defendant unintentionally caused pain, but should have known better as a reasonable person[,] does that satisfy the first burden of proof on count 1 [for child abuse]?" The jury also asked whether the child abuse charge was "specific to the actual moment of pain/injury, or can it apply to a chain of events minutes or hours that led to the moment of pain?" Neither question suggests the jury was struggling with the cause of Daniel's injury. Rather, they reflect that the jury was unsure whether Tokhunts had to intend

---

[7]     Tokhunts suggests the jury also could have found he caused Daniel's injury, but there were other causes as well. He fails, however, to explain why that might have led the jury to convict him of the lesser, but not the greater, offenses.

specifically to inflict pain, and whether the pain had to occur immediately after Tokhunts's actions.

Considering the entire record before us, there is not a reasonable possibility of a more favorable result for Tokhunts had the court instructed the jury on the lesser included offenses. Accordingly, any error in failing to give the instructions was harmless and does not require reversal.[8]

**4.      *The trial court did not rely on an improper aggravating circumstance***

Tokhunts argues the trial court violated section 1170, subdivision (b) by imposing an upper term sentence based on an aggravating circumstance not found true by a jury.

The People alleged two aggravating circumstances in the information:  (1) the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); and (2) Tokhunts has prior convictions that are numerous and of increasing seriousness (*id.*, rule 4.421(b)(2)).  During trial, Tokhunts waived his right to a jury trial on the allegation related to his prior convictions.  After the jury returned its verdict, the court conducted a bench trial on that allegation and found it true beyond a reasonable doubt. At sentencing, the court relied solely on the prior-convictions aggravating circumstance to impose an upper term sentence on the child abuse count.

Effective January 1, 2022, section 1170, subdivision (b) states "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term," unless "there

---

[8]      We would reach the same conclusion under the more stringent harmless error standard articulated in *Chapman, supra*, 386 U.S. at p. 24.

31

are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1), (2).) A court also "may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).) If a trial court relies on aggravating circumstances to impose an upper-term sentence that were not established in accordance with section 1170, subdivision (b), the court violates the defendant's rights under the Sixth Amendment to the United States Constitution. (See *People v. Lynch* (2024) 16 Cal.5th 730, 742–743.)

There is no merit to Tokhunts's contention that the trial court violated section 1170 by relying on an aggravating circumstance that a jury did not find true. The statute allows a trial court to rely on aggravating circumstances that "have been found true beyond a reasonable doubt at trial by the jury *or by the judge in a court trial*." (§ 1170, subd. (b)(2), italics added.) Here, Tokhunts waived his right to a jury trial on the allegation concerning his prior convictions, and the court found it true beyond a reasonable doubt at a court trial. Accordingly, the court's use of that circumstance to impose an upper term sentence did not violate section 1170, subdivision (b).

In his reply brief, Tokhunts concedes he waived his right to a jury trial on the aggravating circumstance. However, he argues his waiver was limited to the issue of whether he suffered the prior convictions, not whether those convictions were numerous and of increasing seriousness.

The record belies Tokhunts's contention. Before taking Tokhunts's waiver, the court explained to him that he had the right to a jury trial on the People's allegation "that you have suffered prior convictions that are numerous and are of increasing seriousness." The court explained what that right entails and then explicitly asked Tokhunts if he wanted to waive his right to a jury trial "on this California Rule of Court 4.421(b)(2)" allegation.[9] On this record, there is no question Tokhunts waived his right to a jury trial on the People's allegation that he suffered "convictions that are numerous and are of increasing seriousness." Tokhunts's insistence otherwise borders on the frivolous.

5.      ***Tokhunts is not entitled to credit for time served in home detention in a different case***

Tokhunts argues the trial court erred by failing to grant him custody credit for approximately 90 days he spent under an electronic monitoring program while awaiting trial in a different case.

---

[9]     Before taking Tokhunts's waiver, the court noted the citation for the aggravating circumstance three times. The court misspoke one of those times, erroneously referring to subdivision (b)(1) instead of (b)(2). The misstatement was harmless, however, because the People did not allege an aggravating circumstance under subdivision (b)(1). The court also explicitly stated the substance of the People's allegation was that Tokhunts had suffered prior convictions that are numerous and of increasing seriousness.

In Case No. 1SV02207, the People charged Tokhunts with six misdemeanor offenses.[10]  He was arraigned on those charges on August 19, 2021.  On the same date, the court in Case No. 1SV02207 ordered Tokhunts to enroll in an electronic monitoring program as a condition of his release.  The same court removed the monitoring condition on November 8, 2021.

At sentencing in this case, defense counsel told the court he was unsure whether Tokhunts is entitled to credit for time served under the monitoring program.  The trial court noted it had not researched the issue, but it believed time spent under an electronic monitoring program does not qualify for credit.  The court declined to grant Tokhunts credit, stating it was open to changing its ruling.

 Under section 2900.5, "days served in home detention pursuant to Section 1203.016 or 1203.018, shall be credited upon [the defendant's] term of imprisonment."  (§ 2900.5, subd. (a).)  For purposes of section 2900.5, "credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted."  (*Id.*, subd. (b).)  Section 2900.5 does not "allow credit for a period of presentence restraint unless the *conduct* leading to the sentence was the *true and only unavoidable basis* for the earlier custody."  (*People v. Bruner* (1995) 9 Cal.4th 1178, 1192 (*Bruner*).)

We will assume, for the sake of argument, Tokhunts spent 90 days in "home detention pursuant to Section 1203.016

---

[10]    We grant Tokhunts's September 24, 2024 revised request to take judicial notice of certain records from Case No. 1SV02207.  (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

34

or 1203.018." (§ 2900.5, subd. (a).) Nevertheless, he is not entitled to credit in this case because the time served was not "attributable to proceedings related to the same conduct" for which Tokhunts was convicted. (*Id*., subd. (b).)

According to the docket, Tokhunts was arraigned on the charges in this case on September 1, 2021, and he posted bail the same day.[11] At that time, Tokhunts was enrolled in the monitoring program as a condition of his release in Case No. 1SV02207. However, Tokhunts points to nothing in the record showing he was required to enroll—or remain enrolled—in a monitoring program as a condition of his release in this case. That the court in this case took no action after the court in Case No. 1SV02207 removed the monitoring condition on November 8, 2021, is a strong indication that he was not.

Nor does the record show the proceedings in Case No. 1SV02207 were related to the same conduct as this case. In Case No. 1SV02207, the People charged Tokhunts with six offenses related to his alleged conduct on March 2, March 25, April 8, and April 11, 2021. The conduct that gave rise to the charges and convictions in this case occurred on March 12, 2021. Accordingly, the convictions in this case arose out of entirely different conduct from the charges in Case No. 1SV02207.

On this record, Tokhunts has not shown the time he spent in home detention is attributable to "proceedings related to the same conduct" for which he was convicted in this case. (See § 2900.5, subd. (b).) Therefore, under the plain language of section 2900.5, he is not entitled to custody credit for that time. (§ 2900.5, subd. (b).)

---

[11] The preliminary hearing took place on December 21, 2021, and the People filed the information on January 4, 2022.

35

We reject Tokhunts's contention that denying him credit would render the 90 days "dead time." As Tokhunts acknowledges, the court in Case No. 1SV02207 gave him credit for the full 90 days when it sentenced him in that case. That the court ordered the term to run concurrent with the base term imposed in this case is irrelevant. Because the court in Case No. 1SV02207 has already given Tokhunts credit for the 90 days he spent in home detention, awarding him credit for the same time in this case would lead to a windfall. (See *Bruner, supra*, 9 Cal.4th at p. 1192 [section 2900.5 was not intended to produce a "dual-credit windfall"].)

[[End nonpublished portion.]]

## DISPOSITION

We affirm the judgment.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


EGERTON, J.

We concur:


EDMON, P. J.


GAAB, J.[*]

_____

[*]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.